STATE EX REL CITY OF LIVINGSTON, MONTANA, RELATOR
AND RESPONDENT, *v.* STATE WATER CONSERVATION
BOARD, RESPONDENT AND APPELLANT, LIVINGSTON DITCH
WATER USERS' ASSOCIATION, INTERVENOR AND APPELLANT.

No. 9731.

332 Pac. (2d) 913.

Submitted March 21, 1958. Decided July 23, 1958.
As Modified on Denial of Rehearing Dec. 29, 1958.

404

Forrest H. Anderson, Atty. Gen., Louis Forsell, Asst. Atty. Gen., Clarence E. Wohl, Sp. Asst. Atty. Gen., Louis Forsell Asst. Atty. Gen., argued orally, for respondent and appellant.

David Fitzgerald, Livingston, argued orally, for intervenor.

Ben E. Berg, Jr., Livingston, argued orally, for respondent.

MR. CHIEF JUSTICE HARRISON:

The City of Livingston instituted this proceeding on April 11, 1953, for a writ of mandate to force the State Water Conservation Board to repair and rebuild certain bridges built over and across the ditch owned by the Board where the ditch intersects and crosses certain streets within the corporate limits of the city.

The Livingston Ditch Water Users' Association intervened in the proceeding to resist the granting of the writ. From a judgment in favor of the City, the Board and the Association appealed.

The facts, material to this appeal, are mostly uncontroverted. In its petition for the writ of mandate, the City of Living-

ston alleged the passage and adoption by the City on May 13, 1901, of Ordinance No. 99, which the City alleged granted the Livingston Land and Irrigation Company "the privilege of constructing said irrigation canal across the hereinbefore named streets and providing, among other things, that the said Livingston Land and Irrigation Company, its successors and assigns, shall keep in good and safe repair all street crossings over and across said canal * * *''.

The trial court found this to be true upon ample evidence in the record. It is apparent that the obligation to keep and maintain bridges and crossings over the ditch at the time of the acquisition of the ditch by the State Water Conservation Board lay with its predecessor, the Livingston Land and Irrigation Co.

In June 1936, the State Water Conservation Board acquired the ownership of an irrigation system, known as the Livingston Ditch Project, for the purpose of furnishing and supplying water for the irrigation of lands in the vicinity of the City of Livingston, under the provisions of section 89-101 et seq., (enacted as Chapter 35, Extraordinary Session 1933-34, and amended by Chapter 95, 1935 Session Laws).

The irrigation system consists of a ditch which diverts water from the Yellowstone River above the City of Livingston; the route of which, in part, extends through the northerly side of the city and intersects and crosses certain streets therein.

The ditch was constructed by the Livingston Land and Irrigation Company in 1902 or 1903. Upon acquiring the ownership of the ditch, the State Water Conservation Board reconstructed and enlarged the same, and now furnishes and supplies water to 100 or more water users for the irrigation of their tracts of land in the vicinity of Livingston. These 100 or more water users are stockholders of the Livingston Ditch Water Users' Association, which is a Montana corporation organized to receive the water from the ditch of the State Water Conservation Board.

On February 3, 1937, the State Water Conservation Board

and the Livingston Ditch Users' Association entered into a contract. The contract specifies the contractual relationship between the State Water Conservation Board, the Livingston Ditch Water Users' Association, and the water users. Under the terms of the contract, the Board agrees to furnish to the Association during each irrigation season the water made available from the project, and the Association agrees to sell such water to its stockholders. The Association also agrees to pay to the Board annually the sum of $1,560, to and including the year 1964, to pay for the cost of the project, *and further agrees to pay to the Board annually, during the useful life of the project such sums as are found necessary to pay the cost of operating, maintaining and repairing the project.*

*As stated in appellants' brief the Association intervened in the proceeding and filed its complaint in intervention, and here appears as an appellant in support of the position of the State Water Conservation Board, as the water users are the ultimate payers under the above contract if the City of Livingston may avoid any duty to maintain the city streets together with the bridges.*

In its petition for a writ of mandate the City of Livingston alleged that the State Water Conservation Board, and its predecessor in interest, built bridges over and across the ditch where the ditch intersects and crosses certain streets in Livingston; that the bridges are in a dilapidated, deteriorated and rotting condition, and are in immediate need of extensive repairs; that the State Water Conservation Board refuses to repair and rebuild them; that under and by virtue of sections 89-106 and 89-821, R.C.M. 1947, the duty of maintaining and keeping in good repair all bridges and crossings in the above-named streets over and across the canal is specifically enjoined upon the Board.

After issues were duly joined the proceeding came on for trial on June 28, 1955. On January 23, 1956, the court made its findings of fact and conclusions of law, and concluded as a matter of law that the Board had a duty, in which it had

failed, resulting from its office, trust, or station to maintain and keep in repair the bridges across its canal on Front, Seventh, Fifth, E, and G Streets, in the City of Livingston, Montana.

Judgment was entered on February 7, 1956, in accordance with the court's findings and conclusions, and on February 11, 1956, a peremptory writ of mandate issued in which writ the Board was not only commanded to repair the bridges, but to "thereafter maintain said bridges in good repair."

This is an appeal from a mandamus proceeding. Before we can affirm the judgment of the district court it must appear that some law enjoins upon the Water Conservation Board in its office, trust or station, an affirmative duty to repair the bridges in question. R.C.M. 1947, section 93-9102; Raleigh v. First Judicial District Court, 24 Mont. 306, 314, 61 Pac. 991, 81 Am. St. Rep. 431; State ex rel. Bean v. Lyons, 37 Mont. 354, 365, 96 Pac. 922; State ex rel. Stuewe v. Hindson, 44 Mont. 429, 438, 120 Pac. 485; State ex rel. Koefod v. Board of Commissioners of Hill Co., 56 Mont. 355, 358, 185 Pac. 147.

That such a law exists is contended for by the respondent herein, its scope, content and effect being contained in sections 89-106 and 89-821, supra.

R.C.M. 1947, section 89-106, provides:

"The state water conservation board of the state of Montana shall have the power to construct irrigation works across any stream of water, watercourse, streets, avenues, highways, railways, canals, ditches or flumes which the route of said canal or canals may intersect or cross, in such manner as to afford security to life and property; *but the board shall restore the same, when so crossed or intersected, to its former state, as near as may be, so as not to destroy its usefulness;* and every company whose railroads shall be intersected or crossed by said works shall unite with said board in forming said intersection and crossing; and if such railroad company and said board, or the owners and controllers of said property, thing, or franchise so to be crossed cannot agree upon the amount to be

paid therefor, or the points or the manner of said crossing or intersections, the same shall be ascertained and determined in all respects as herein provided in respect to taking of land for public use." Emphasis supplied.

R.C.M. 1947, section 89-821, provides:

"Any person who digs and constructs ditches, dikes, flumes, or canals over or across any public roads or highways, or who uses the waters of such ditches, dikes, flumes, or canals, is required to keep the same in good repair at such crossings or other places where the water from any such ditches, dikes, flumes, or canals may flow over, or in anywise injure any roads or highways, either by bridging or otherwise."

With regard to the latter section first, it is argued by appellants that it does not apply to the Board. With this argument we must agree.

It is well-settled that general words in a statute which might have the effect of restricting governmental powers are to be construed as not applying to the state or its subdivisions. In re Estate of Miller, 5 Cal. (2d) 588, 55 Pac. (2d) 491; Balthasar v. Pacific Electric R. Co., 187 Cal. 302, 202 Pac. 37, 19 A.L.R. 452; Butterworth v. Boyd, 12 Cal. (2d) 140, 82 Pac. (2d) 434, 126 A.L.R. 838; Attorney General v. City of Woburn, 322 Mass. 634, 79 N.E. (2d) 187; 82 C.J.S. Statutes section 317, pages 554, 555, 557. In the latter work the author states:

"The government, whether federal or state, and its agencies are not ordinarily to be considered as within the purview of a statute, however general and comprehensive the language of act may be, unless intention to include them is clearly manifest, as where they are expressly named therein, or included by necessary implication.

"*This general doctrine applies, or applies with special force, to statutes by which prerogatives, rights, titles or interests of the government would be divested or diminished, or to statutes under which liabilities would be imposed on the government.*" Emphasis supplied.

It should be noted that by section 89-822, R.C.M. 1947, the

act provides: "Any person offending against the preceding section [section 89-821], on conviction thereof, shall pay for every offense a fine of not less than twenty-five dollars, nor more than one hundred dollars, with costs of prosecution."

The application of section 89-821 could certainly impose a liability. Therefore, if the State Water Conservation Board is tantamount to the State of Montana, or is an agency of the State of Montana then necessarily section 89-821 has no application to it.

That the State Water Conservation Board is an agency of the state, performing governmental functions is settled by the Act itself. R.C.M. 1947, section 89-126. The question was also decided in Broadwater- Missouri Water Users' Ass'n v. Montana Power Co., 9 Cir., 1944, 139 F. (2d) 998, 1000, wherein the Circuit Court of Appeals, reviewed the question of the Board's status and concluded:

"The terms of the statute and the holding in the Cooney case leave little room for doubt that the Board is a mere arm of the sovereign. Its members are state officers. The duties they perform might appropriately have been delegated solely to existing constitutional officers and performed directly in the name of the state. While appellee insists that the rights, property and funds held by the Board are not owned by the state, the actuality of state ownership would become immediately evident if the Legislature were to abolish its agency. Cf. Wilson v. State Water Supply Commission, 84 N.J.Eq. 150, 93 A. 732. In view of the scope of modern governmental activities it would be impertinent to inquire, as appellee would have us do, whether the federal courts may disregard the legislative declaration to the effect that the functions of the Board are governmental. Certainly the conservation and development of its public waters is an enterprise of fundamental concern to an arid state like Montana, where recurring droughts point the urgent need for such a program."

While the Federal Court's decision is not binding on this court, since the interpretation of our laws is primarily a

function to be performed by our courts, nevertheless the language of the case, in view of the statute, is compelling authority for this court to follow. Furthermore, in State ex rel. Normile v. Cooney, 100 Mont. 391, at page 406, 47 Pac. (2d) 637, at page 645, the court said:

"By provisions of the acts in question, the water conservation board is declared to be a body corporate and to be deemed an agency of the state of Montana; a public corporation."

In addition it must be observed that section 89-821 was and has been continually the law of this state since 1870 (Section 10, Laws 1870, page 58). Sixty-two years elapsed between its enactment and the enactment of Chapter 35, Extraordinary Session 1933-34. Had the Legislature intended to encompass the Board within the scope of the section they certainly would have amended the section so as to manifest that intention.

We now advance to a consideration of section 89-106 and ▮▮▮ raise the question if the requisite duty to repair is expressed in, or can be implied from that section, or from its accompanying sections.

A reading of section 89-106 reveals no intention of the Legislature that the Board has the affirmative duty to repair bridges which are necessitated by its works.

The section provides that the Board has a right to cross streets, avenues, highways, etc., however, when the Board exercises this right it has an affirmative and concomitant duty to restore the same to its former state, as near as may be, so as not to destroy its usefulness. Thus, there is expressed in the statute an affirmative duty to build, but the section is silent regarding the duty to maintain that which is built. Can such a duty be implied from the wording of the section or from other portions of the Act?

R.C.M. 1947, section 89-102, subds. (b), (c) and (e) provide:

"(b) The word 'works' shall be deemed to include all property, rights, easements and franchises relating thereto and deemed necessary or convenient for their operation, and all water rights acquired or exercised by the board in connection

with such works, and shall embrace all means of conserving and distributing water, *including, without limiting the generality of the foregoing,* reservoirs, dams, diversion canals, distributing canals, lateral ditches and pumping units, mains, pipelines and water-works systems and shall include all such works for the conservation, development, storage, distribution and utilization of water including, *without limiting the generality of the foregoing,* works for the purpose of irrigation, development of power, watering of stock, supplying of water for public, domestic, industrial and other uses for fire protection.

"(c) The term 'cost of works' shall embrace the cost of construction, the cost of all lands, property, rights, easements and franchises acquired, which are deemed necessary for such construction, the cost of all water rights acquired or exercised by the board in connection with such works, the cost of all machinery and equipment, financing charges, interest prior to and during construction and for a period not exceeding three (3) years after the completion of construction, cost of engineering and legal expenses, plans, specifications, surveys, estimates of cost, and other expenses necessary or incident to determining the feasibility or practicability of any project, administrative expense and such other expenses as may be necessary or incident to the financing herein authorized and the construction of the works and the placing of the same in operation. * * *

"(e) The word 'project' shall mean any one of the works hereinabove defined or any combination of such works which are physically connected or jointly managed and operated as a single unit." Emphasis supplied.

R.C.M. 1947, section 89-105, enjoins upon the Board the duty to make estimates of the "cost of the project," (project as defined above or equated with "works") of the cost of maintaining, preparing and operating the same, and of the revenues to be derived therefrom, "and no such project shall be constructed unless, according to such estimates, the revenues to be derived therefrom will be sufficient to pay the cost of *main-*

*taining, repairing* and operating the same, and to pay the principal and interest of revenue bonds which may be issued for the cost of such project * * *." Emphasis supplied.

Under the provisions of section 89-111, subd. (3) (d), the Board in issuing bonds for the purpose of paying the cost of the "project" is empowered to "covenant to fix and establish such prices, rates and charges for water and other services made available in connection with such works or project so as to provide at all times funds which will be sufficient, (1) *to pay all costs of operation and maintenance of such works or project together with necessary repairs thereto* * * *." Emphasis supplied.

R.C.M. 1947, section 89-115, provides:

"The board is hereby authorized and empowered, subject to the provisions of this act, to fix and establish the prices, rates and charges at which any and all the resources and facilities made available under the provisions of this act shall be sold and disposed of; to enter into any and all contracts and agreements, and to do any and all things which in its judgment are necessary, convenient or expedient for the accomplishment of any and all the purposes and objects of this act, under such general regulations and upon such terms, limitations and conditions as it shall prescribe; *and it is and shall be the duty of the board to enter into such contracts and fix and establish such prices, rates and charges so as to provide at all times funds which will be sufficient to pay all costs of operation and maintenance of any and all of the works authorized by this act, together with necessary repairs thereto,* and which will provide at all times sufficient funds to meet and pay the principal and interest of all bonds as they severally become due and payable; provided, that nothing contained in this act shall authorize any change, alteration or revision of any such rates, prices or charges as established by any contract entered into under authority of this act except as provided by any such contract." Emphasis supplied.

While the statute, defining "works," "cost of works", and

"project" does not include by express mention, "bridge", nevertheless an integral part of the cost of a project, and an integral part of a "work" which cuts across, intersects, or divides a highway, road, or avenue, is the bridge which the Board is duty bound to construct at such intersection. R.C.M. 1947, section 89-106. Can it logically be argued that the cost of restoring a road to its former state is not a cost of the project? The question supplies its own answer.

In section 89-105, supra, the board is enjoined to estimate the "cost of the project" and the cost of maintaining and operating the same, and the cost of the project, repairs, and operations must be borne by the revenue from the project. As heretofore noted an initial cost of the project includes the construction of any bridges necessitated by the project. When, therefore, the statute directs the Board to raise sufficient revenue to pay for the maintenance and repair of the project, does it refer only to the ditches, dams, canals, etc., or does it refer to all the items which must be initially estimated as a cost of the project—including bridges? Again the question presents its own answer. A necessary implication, which a reading of all the sections of the Act together raises, is that concomitant with the duty of constructing bridges, so as to restore roads, highways and streets to their former usefulness, is a duty to maintain bridges made necessary by the project.

Appellant argues, however, that streets belong to the state; that the ditches of the State Water Conservation Board belong to the state; that the primary duty and obligation of repair of city streets, including bridges is on the city, and that therefore it must necessarily follow that there is no duty by law imposed upon the Board to make the repairs.

With the propositions preceding the conclusion we find no argument. Streets and highways are owned by the sovereign, City of Billings v. Herold, 130 Mont. 138, 296 Pac. (2d) 263; Bidlingmeyer v. City of Deer Lodge, 128 Mont. 292, 274 Pac. (2d); ditches of the State Water Conservation Board do belong to the state, R.C.M. 1947, section 89-104; the primary

414

duty to repair city streets including bridges does repose on the city, State ex rel. Judith Basin County v. Poland, 61 Mont. 600, 203 Pac. 352; City of Helena v. Helena Light & R. Co., 63 Mont. 108, 207 Pac. 337; Ledbetter v. City of Great Falls, 123 Mont. 270, 213 Pac. (2d) 246, 13 A.L.R. (2d) 903. However, these principles do not divest the state of the power to shift the responsibility of repairing bridges to the separate political entity which caused the disruption of a public concourse.

An incident of the very sovereignty in which reposes the right-of-way, in public roads, streets and highways is the power to shift the burden of repair from one political subdivision of the state to another. Here the shift was from the city to a state agency. An interpretation of the statutory provisions quoted from and cited above manifests the intention of the Legislature in this regard and leaves no doubt that this was the result sought after. Moreover, the justice of such a result comes to light upon observing certain fundamental principles collaterally involved and argued in this case.

*First,* it is the well-settled, common-law rule, that the owner of a ditch who chose to cross a public road or thoroughfare with his ditch had an affirmative duty, not only to construct a bridge across his ditch, but to maintain that bridge in good repair at all times, City of Indianapolis v. Indianapolis Water Co., 185 Ind. 277, 113 N.E. 369; Richardson County ex rel. Sheehan v. Drainage District No. 1, 92 Neb. 776, 139 N.W. 648, 43 L.R.A., N.S., 695; Hidalgo County Water Control & Improvement Dist. No. 1 v. Hidalgo County, Tex. Civ. App. 1939, 134 S.W. (2d) 464; Annotation Cases 1914A, 550; 43 L.R.A., N.S., 695; 61 L.R.A. 566.

*Secondly,* in effect the general rule has been codified into Montana law under the provisions of section 89-821. In appellants' brief, however, he would have us construe the statute in the following manner; "The ditch digger's duty was to keep the water of his ditch from flowing into the road. He could

do it either by fixing the bank of the ditch or by building a bridge if that would prevent the overflow. * * *

"The only way of offending against section 89-821 is by failing to keep the ditch or canal in good repair in places where the ditch or canal crosses the road or highway, or other places where the water from any such ditches * * * or canals may flow over or in any wise injure any road or highway."

The point, of course, which is overlooked by appellants is the fact that if a ditch intersects and cuts through an existing road, then the bottom of the ditch insofar as it crosses the road, is a portion of the road, and water flowing through the ditch would certainly flow over that particular portion of the road so as to require either a bridge or conduit pipe, to keep the water from flowing onto the road.

While section 89-821 does not apply to a state agency, nevertheless it reflects the attitude Montana has taken toward the duty owed by one whose ditches cut across public roads.

That the state may, in its sovereign capacity, ignore this common-law duty and repose it upon the city goes without argument. City of Indianapolis v. Indianapolis Water Co., supra, 113 N.E. 369, 273; Hidalgo County Water Control & Improvement Dist. No. 1 v. Hidalgo County, Tex. Civ. App., 134 S.W. (2d) 464, 468.

However the injustice of imposing the affirmative duty to repair and maintain such bridges upon the city is made manifest by the following language quoted from the Hidalgo case, supra, 134 S.W. (2d) 464, 468: "To give one the power, without liability, to destroy or materially impair existing lawful improvements of the other would be subversive of the design and purpose of the public policy declared in the organic law respecting each agency. It is not conceivable that such was the purpose of the legislature, and that destructive purpose may be avoided only by construing the statute as we have construed it, which construction we deem to be reasonable in the light of the language of the act."

Thus, while the State of Montana as a sovereign, could have

avoided the common-law duty or statutory duty of repairing the bridge over its canal, they chose not to avoid it in this case by implication in the Water Conservation Act.

In the Hidalgo case, supra, the Texas Court of Civil Appeals had before it two statutes similar in purpose and effect to sections 89-106 and 89-821 of our Civil Code. Their similarity is expressed by the Texas Court's review where that court observed:

"So, it will be seen that the general statute, Art. 7585, requires that the entities to which it applies to 'build and maintain' and pay for bridges over their canals at county road crossings; whereas, the more specific statute providing for organization, government and control of public water improvement districts, requires such districts to 'build' such bridges at their own expense. Arts. 7746, 7880-123, Vernon's Ann. Civ. Stat.''

In holding that the improvement district had the duty to repair the bridges, the Texas Court said: ''It has been held that an authority given a governmental agency to expend funds to 'build' a public improvement carries with it, by necessary implication, the further authority in that agency to use such funds to repair and maintain the completed improvement. Bell County v. Lightfoot, 104 Tex. 346, 138 S.W. 381. We are inclined to take the implication a step further and hold that in view of the history of this and related legislation and of the public policy crystallized therein, and giving effect to necessary implications from the several statutes, to say nothing of the apparent justice of the case, it was the intention of the legislature in enacting Arts. 7746 and 7880—123 to require appellant and similar districts to restore county roads to the same condition of safety in which the districts find and cross them; to relieve the county of any expense made necessary by the intrusion of the district upon its prior easement. Because of the very nature of said intrusion—a sort of legal trespass —the statute by express language put the duty upon the district to restore the status quo ante, and by implication, to maintain

that status so long as the district obstructs the free use of the county's prior easement.''

Appellants argue further that the cases cited heretofore are primarily ones involving private as opposed to public interests, and therefore have no application here.

While there is little doubt that the Water Conservation Act had for its purpose a public one,—one to benefit the whole state (Broadwater-Missouri Water Users' Ass'n v. Montana Power Co., supra), nevertheless the works constructed benefit those most who were immediately affected thereby, and who could purchase the water from the Board. As heretofore noted in the statutes referred to, the ultimate cost of the maintenance is not borne by the Board but by the water users. The Act demands the burden be transferred to them.

Appellants admit in their brief that: ''The Association intervened in the proceeding and filed its Complaint in Intervention and here appears as an appellant in support of the position of the State Water Conservation Board, *as the water users are the ultimate payers under the above contract* if the City of Livingston may escape its general duty to maintain the city streets together with bridges thereon.'' (Emphasis supplied.)

In Richardson County ex rel. Sheehan v. Drainage District No. 1, supra, 139 N.W. 648, 651, the court was faced with the contention the improvement was public rather than private in character, and said:

''It is contended that, the drainage district being a public corporation, the statute does not affect it, and, further, that, since the drainage works are for the public benefit, the reasoning of the common law based upon the private advantage to the owner of a mill, a canal, or railroad does not apply. While a scheme of drainage in this state must be 'conducive to the public health, convenience, and welfare' as a statute requires in order to warrant the exercise of the police power in its behalf, yet for pecuniary benefit to the incorporators such districts are usually formed. It would be difficult to find a sufficient

number of altruistic individuals to form a district and bear its
burdens and expenses without the pleasing prospect of future
benefit in increased productiveness of the lands affected or by
enhancement in their value. Private advantage is the main-
spring of the movement, and the same reasons exist whether
the form of the controlling authority be public or private.''

The same effect exists under the Water Conservation Act.
 *The cost of the project must be borne by revenues.* In
other words, the Board has no power to construct a series of
works or projects from which the revenue would be insuffi-
cient to pay for the cost, maintenance or operation of the same.

While the above discussion sufficiently settles the question
of an existing duty in the Board to maintain and repair bridges,
caused by its works, there is one more question which remains
to be considered. As noted above the trial court commanded
the Board to, not only repair and rebuild the bridges, but also
to ''thereafter maintain said bridges in good repair.'' The ef-
fect of the language ''and to thereafter maintain said bridges
in good repair'' is to subject the members of the State Water
Conservation Board to possible contempt charges hereafter.

The proper function of mandamus is to compel the doing of
a specific thing. It contemplates the necessity of indicating the
precise thing to be done, and so is not an appropriate remedy
for the enforcement of duties generally, or to control and regu-
late a general course of official conduct for a long series of
continuous Acts to be performed under varying conditions. 34
Am. Jur., Mandamus, section 74, page 864.

''The ordinary office of the writ of mandamus is to coerce
 the performance of single acts of specific and imperative
duty, something which can be neither diminished nor subdivid-
ed; and ordinarily it is not an appropriate remedy to compel
a general course of official conduct or a long series of continu-
ous acts, to be performed under varying conditions, the view
being taken that it is essential that respondent should know
precisely what he is to do, and furthermore that it is impossi-
ble for the court to oversee the performance of continuous

duties.'' 55 C.J.S. Mandamus section 66, page 109.

While there may be exceptions to the general rule quoted above, (see in general 34 Am. Jur., Mandamus, section 74, page 864) this case clearly does not fall within them. There is no indication that the Board, after this court defines and delimits its duty in regard to the repair of bridges caused by its works will not thereafter perform its duty. The writ of mandate should be modified by striking out ''and to thereafter maintain said bridges in good repair.''

For the foregoing reasons the judgment of the trial court is affirmed as modified, cause to be remanded to the district court to proceed in accordance with this opinion.

MR. JUSTICES CASTLES, ANGSTMAN and ADAIR, and THE HONORABLE W. R. FLACHSENHAR, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, concur.